UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

Charles Okon,                                    CV-06-6810
                        Plaintiff,               (CPS)(KAM)

    - against -
                                                 MEMORANDUM
Tracy Appia, individually and as                 OPINION AND
Program Director, and The Salvation              ORDER
Army,

                        Defendants.
-----------------------------------------X
SIFTON, Senior Judge.

    Plaintiff brings this action alleging that defendants

discriminated against him on the basis of his sex, in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

*et seq*. ("Title VII"), 42 U.S.C. § 1983 ("Section 1983" or "§

1983"), New York State Executive Law § 296, Sections 8-107 *et*

*seq*. of the Administrative Code of the City of New York, and New

York State Labor Law §§ 198(1-a) and 198-c.  Now before this

Court is defendants' motion for summary judgment.  For the

reasons set forth below, defendants' motion is granted.

**Background**

    The following facts are drawn from the parties' depositions,

declarations, exhibits, and Local Rule 56.1 statements.  Disputes

are noted.

    Plaintiff was hired by defendant Salvation Army on June 16,

1997 to work at the Bond Street Drop-in Center (the "Center"), as

a case manager.  Def. Ex. E; Pl. Ex. 59.  The Center offers

twenty-four hour services for homeless individuals, known within

the Center as clients.  Def. Ex. NN.  As a case manager at the

Center, plaintiff's duties included meeting with and assessing

clients' suitability for the center, developing service plans to

help clients move towards housing and employment, helping clients

apply to assistance and training programs, and otherwise tracking

the progress of his clients.  *Id.*  He was also required to attend

staff meetings scheduled by his direct supervisor, the Social

Services Supervisor.  *Id.*  Plaintiff signed a statement that he

had read his job description and would adhere to The Salvation

Army's policies.  *Id.*

On February 13, 1998, a "Record of Offense and Warning" was

issued to plaintiff.  Def. Ex. H; Pl. Ex. 27.  Plaintiff had

received holiday pay for July 4, 1997, but later requested a day

off based on his having worked on July 4.  *Id.*  The Record warned

plaintiff that "[o]nce your [sic] paid for a Holiday - you cannot

request the same day to be off.  You no longer have the day once

you're paid for it."  *Id.*  Plaintiff disputed the violation,

writing in the explanation section of the form:

> As per Mr. Alfred J. Peck Memorandum dated 12/23/97.
> As an exempt employee, I am not entitled to paid
> Holidays, but I can take the time worked in a latered
> [sic] date as compensatory time.  Please check your
> records properly because I will strongly reject any
> negative record in my file.  Thanking in Advance [sic]
> for your cooperation.

*Id.*  The form was signed by plaintiff's then supervisor, Yvonne

Miller, as well as plaintiff.

On January 11, 2000, plaintiff received another warning, in the form of a memorandum from Christopher Garcia, Director of Social Services, which stated that plaintiff was being "formally . . . reprimanded for failure to return to work on a timely basis." Def. Ex. I; Pl. Ex. 33. Plaintiff had failed to return from approved leave on January 3, 2000. *Id.; see also* Def Ex. J. In a conversation with Garcia and Miller on January 10, plaintiff told them that he had been ill while on leave and that his doctor had sent a note stating plaintiff would have to be out for a longer period. *Id.* Defendant Salvation Army failed to receive this note[1] and the memorandum of warning made clear that it was plaintiff's responsibility to communicate his situation directly. *Id*. The memorandum concluded that if plaintiff again failed to return to work when expected without notification, he could be suspended or terminated. *Id.* A follow-up memorandum, also from Garcia, dated January 11, 2000, stated that, as a result of plaintiff's failure to return to work on January 3 without notice, plaintiff would not be paid for the period of January 3, 2000 through January 7, 2000 and that a letter of reprimand would be placed in plaintiff's file. Def. Ex. J; Pl. Ex. 34.

On February 9, 2000 Garcia sent plaintiff another memorandum

---

[1] Plaintiff, however, has included in his exhibits a December 30, 1999, letter from Dr. Michael Akpan, apparently faxed to Garcia. Pl. Ex. 35. Dr. Akpan wrote that plaintiff had been admitted to a medical center near where plaintiff was vacationing in Nigeria due to "acute malaria" and had to be treated for a period of five days. *Id.*

(not annexed as an exhibit to the motions), chastising him for submitting a required statistical report late. *See* Def. Ex. L; Pl. Ex. 29. Plaintiff responded on February 10, 2000. *Id*. Plaintiff asserted that the delay resulted from the fact that, on the days the statistics needed to be done, he was the only case manager on duty and had other duties to which to attend. *Id.* He also stated that he had not been given any instruction on how to complete his report, had received one page late, and had taken the report home to work on in his spare time. *Id.* Garcia communicated, by memorandum dated February 16, 2000, that he did not believe any of plaintiff's explanations justified plaintiff's tardy submission and that, in the future, he would be monitoring plaintiff's submissions of his statistics for timeliness and accuracy. Def. Ex. M; Pl. Ex. 30.

On February 16, 2000, Miller sent a memorandum to Garcia concerning plaintiff. Having reviewed plaintiff's case files, Miller expressed "grave concern regarding the status of [plaintiff's] case records. Presently [plaintiff] has 128 record [sic] in his file cabinet, without exception each and every record that I reviewed is out of compliance [with The Salvation Army protocols]." Def. Ex. K; Pl. Ex. 28. Miller continued that she would perform a more detailed assessment and requested an emergency meeting with plaintiff and Garcia to develop a plan to resolve the problem. *Id*.

By memorandum dated March 1, 2000, Garcia expressed this concern to plaintiff. Def. Ex. N; Pl. Ex. 31. Garcia noted several specific deficiencies, including a lack of client progress notes, failure to meet with a client for a service plan review, and an inability of other personnel to find necessary information when plaintiff was out of the office. *Id.* Garcia also noted that, of all the Center's case managers, Garcia received the most complaints about plaintiff and requests to transfer to other case managers from plaintiff's clients. *Id.* Garcia scheduled a meeting with plaintiff and Miller for March 7, 2000 to follow up on these issues. *Id.*

The meeting occurred and Garcia set forth the recommendations from the March 7 meeting in a memorandum of the same date. Def. Ex. O; Pl. Ex. 32. Plaintiff was directed to implement the following recommendations by March 24, 2000 or be subject to probation or termination:

> 1. All case records must be brought up to date.
>    (A) all intakes must be completed.
>    (B) all clients that are no longer here, cases must be closed.
>    (C) progress notes must accompanied [sic] all of the record
> 2. Record <u>must</u> be kept up to date on a regular bases [sic].
> 3. Greater effort must be made to close cases that have been here more then [sic] a year.
> 4. Statistical reports must be submitted on a timely basis.
> 5. Assigned group activity must be done.
> 6. Clients' [sic] must be seen on a timely bases [sic], as well as followed-up.

*Id.* (emphasis in original). The memorandum was signed by Garcia and plaintiff. *Id.*

In July 2002, defendant Tracy Appia was transferred to the Center as the Program Director.[2] *See* Pl. Ex. 9; Ex. A to Decl. of T. Appia. As Program Director at the Center, Appia had full responsibility for the Center's operation, directly supervising the Social Service Supervisors (later called Social Service Directors), Officer Manager, and Operations Director, and indirectly supervising other staff, including case managers. *Id.* She was also required to assure adequate staff for service coverage and to make recommendations with respect to all personnel actions. *Id.* Although plaintiff's immediate supervisor would have been a Social Service Supervisor, Appia often supervised plaintiff directly as the intermediate position was frequently vacant. Pl. Ex. 15 (Appia Dep. at 80).

According to plaintiff, between July 16, 2002 and his termination on April 7, 2005, Appia touched, squeezed, or pinched plaintiff approximately 3,500 times. Pl. Ex. 10 (Okon Dep. at 48-53, 103). The first pinch occurred after plaintiff had given Appia a ride home. *Id.* at 60-61. When they arrived at her home, she asked plaintiff to come in. He declined, but as she was getting out of the car, Appia squeezed plaintiff's face and said

---

[2] During the time Appia occupied a different position within The Salvation Army, she attended sexual harassment training. Def. Ex. PP.

"I'll see you tomorrow." *Id.* at 64-65. The following week, plaintiff testified that Appia pinched him multiple times over several days, including one day when she pinched him around his groin while they were meeting in his office. *Id.* at 75-77. After she pinched his groin, plaintiff told Appia to stop, as he did not like being pinched. *Id.* at 82. Plaintiff specifically recalled being pinched on the buttock sometime during the week of July 22, 2002, *id.* at 97-98, after which he again told her to stop. *Id.* at 90-92. He also testified that she pinched him on the neck, groin, and back during the week of September 2, 2002. *Id.* at 101. Though the plaintiff testified the pinching continued until his termination, plaintiff was unable to recall other specific dates.[3]

Soon after Appia's arrival at the Center, memoranda were sent on August 19 and August 26, 2002, informing employees of a mandatory staff meeting scheduled for 1 p.m. on August 29. Def. Exs. Q and R; Pl. Exs. 18 and 19. Plaintiff did not attend the meeting. On August 30, 2002, defendant Appia sent plaintiff a memorandum following up a verbal warning he received after missing the August 29 meeting. After referring to the memoranda regarding the meeting, Appia wrote, "[b]e advised that staff

---

[3] Case Manager Arlyn Claudio testified that from the time she started working at the Center, she saw Appia request that plaintiff sit beside her at meetings. Pl. Ex. 14 (Claudio Dep. at 9-17). She also testified that Appia pinched plaintiff at these meetings either on the top of his hand or just above his wrist. *Id.* at 11-13.

meetings are a part of your ongoing professional development and
are a required element of your employment.  Failure to attend
further meetings without being excused by a supervisor will
result in disciplinary action."  Def. Ex. P; Pl. Ex. 20.

     Plaintiff also received a performance evaluation at the end
of August, 2002.  Pl. Ex. 22.  He received a rating of 4 or 5
(commendable) in the areas of Quantity of Work, Job Knowledge,
and Adaptability.  He received a rating of 3 (marginal) in the
following areas: Quality of Work, Timeliness of Work, Safety,
Initiative, Attitude, Communication, Relationship with Others,
Attendance/Punctuality, and Overall Performance Rating.  *Id.*  In
a section for his comments, plaintiff wrote:

> I strongly do not agree.  This evaluation is fraudulent
> because Ms. Robin Deroche has never met with me or
> reviewed my job performance.  I have trained most of
> the new staff because she was never available to do so.
> I have also trained the social supervisor on many
> policies and procedures.  I believe this evaluation to
> be done maliciously.

*Id.*  The evaluation was signed by plaintiff and Appia.

     Shortly after Appia's arrival at the Center, plaintiff's
work schedule was changed.  Effective September 9, 2002,
plaintiff was required to work from 2 p.m. to 10 p.m., rather
than from 4 p.m. to 12 a.m., on Thursdays.  Def. Ex. S; Pl. Ex.
21.[45]  Although, according to defendant Salvation Army, this

_____

     [4] According to defendants, another shift change, which occurred in
2003, was enacted to allow plaintiff to be in the Center during the day when
he could reach agencies that might help his clients.  Lockspeiser Decl. ¶
44.5.  Plaintiff asserts this additional change unfairly required him to work

change was to facilitate plaintiff's attendance at the staff meetings, plaintiff nevertheless missed another of the weekly meetings on September 19, 2002.  Def. Ex. T; Pl. Ex. 42.  A written record of the offense was signed by Appia.  Plaintiff apologized and explained that he believed the staff meetings were bi-weekly rather than weekly, signing below his explanation.  *Id*.

On April 9, 2003, an unspecified incident occurred at the Center and was witnessed by plaintiff.  Plaintiff was again reprimanded, in writing, for failing to report the incident to the program director within the three hour time frame required by defendant's policies.  Def. Ex. U; Pl. Ex. 43.  The written record of the reprimand was signed by Appia.  Plaintiff explained that he thought another individual had reported the incident and signed below his explanation.  *Id*.

On April 26, 2003, Timothy Ruffin, a Social Service Supervisor, reviewed plaintiff's files.  Def. Ex. V; Pl. Ex. 44. He concluded that several of the files remained below The Salvation Army's standards.  *Id.*  He also required plaintiff to update his charts immediately and stated that he would discuss disciplinary action with plaintiff on May 1.  *Id.*

---

irregular shifts during the week.  On Tuesdays, plaintiff came in to work in the morning; On Thursdays, he arrived at 2:00 p.m.; and on Wednesdays, Fridays, and Saturdays, plaintiff arrived at 4:00 p.m.  Pl. Ex. 10 (Okon Dep. at 207).

[5]  Plaintiff alleges that he was required to work two extra hours on Thursdays since Appia did not schedule his replacement to start until midnight.

In May 2003, according to plaintiff, the alleged sexual harassment escalated and Appia cuddled and fondled plaintiff on eight occasions. Pl. Ex. 10 (Okon Dep. at 152-56). In one instance, Appia entered plaintiff's office and pushed and rubbed her breasts up against his chest. *Id.* at 160-61. She grabbed his arms and pulled him into her. *Id.* at 162-63. He was eventually able to free himself from her grasp. *Id.* at 165. While he was resisting, plaintiff told Appia several times "I don't like this, let me go." *Id.* at 169. Plaintiff could not recall similar details concerning the other seven instances of cuddling and fondling. *Id.* at 173-88. Also in May 2003, Appia made a derogatory comment concerning plaintiff's impending marriage,[6] stating, "just because a girl in Africa give you p****, must you go and marry her." *Id.* at 190.[7] According to plaintiff, his colleagues Wanda Rio and Wanda Jordan heard this statement and, once Appia had left, emerged from their offices with their mouths open, as if in shock. *Id.* at 194.

On August 6, 2003, upon his return from his vacation, plaintiff was placed on probation for ninety days due to his

---

[6] Plaintiff was about to take several weeks of vacation for his wedding. *See*, *e.g.*, Pl. Ex. 10 (Okon Dep. at 58-59, 191). Plaintiff was married in Nigeria on July 19, 2003, under traditional or customary law, wherein the parties meet each others families and exchange gifts. *Id.* at 228. Plaintiff was legally married in the United States to his fiancée in May 2005. *Id.* at 229.

[7] In his EEOC complaint, plaintiff stated that Appia said "Just for having one-time-sex with a woman you don't know, just marry her." Pl. Ex. 5.

failure (1) to meet with program participants in a timely manner, (2) to update case records, and (3) to file case notes.  Def. Ex. W.  The memorandum advising plaintiff of this action also required him to take a series of steps to complete his probation. *Id.*  The document was signed by plaintiff and Appia.  *Id.*

Also in August 2003, plaintiff reported the pinching, cuddling, fondling, and other conduct to Appia's boss, Jeanette Charles.  Pl. Ex. 10 (Okon Dep. at 46, 123-42, 170-73, 189, 197-198).  He told Charles that, because he resisted Appia's advances, Appia had changed his work schedule, had banned plaintiff from placing people in defendant Salvation Army's Homeward Bound Program,[8] took completed cases away from him and gave them to other case managers so they would received credit, destroyed plaintiff's resource book, which he began compiling in 1994, wrongfully placed him on probation, wrongfully passed him over for advancement,[9] failed to punish other individuals for more serious infractions,[10] and ignored the chain of command by

---

[8]  Through the Homeward Bound Program, defendant Salvation Army sends homeless individuals back to their families in the United States, Puerto Rico, and the Virgin Islands.  Pl. Ex. 10 (Okon Dep. at 128).

[9]  Plaintiff never applied for any position beyond case manager, however.  Pl. Ex. 10 (Okon Dep. at 200).

[10]  Plaintiff testified that one staff member sexually abused a client, and that he suffered no consequences.  He also testified that this same employee mishandled or lied about two incidents, in which one client was stabbed and another died in the Center's bathroom of a drug overdose.  Pl. Ex. 10 (Okon Dep. at 134).  Instead of being reprimanded, plaintiff alleges this employee was promoted.  *Id.* at 136.  Plaintiff does not provide his basis for these conclusory allegations.

personally supervising plaintiff instead of allowing his immediate supervisor to do so. *Id.* at 128-135.

On December 16, 2003, plaintiff received a memorandum from Charles, reminding him of his duty to attend all scheduled staff meetings, after he had missed a meeting scheduled for that day. Def. Ex. X; Pl. Ex. 45. Charles left defendant Salvation Army in early 2004.

On July 27, 2004, plaintiff received a memorandum from Appia reminding him of and attaching defendant Salvation Army's lateness policy. Def. Ex. Y; Pl. Ex. 47. Plaintiff testified that while he had been late and had not called prior to the start of his shift, as the policy required, this was because he had had a flat tire and called Appia as soon as he could borrow a cell phone. Pl. Ex. 10 (Okon Dep. at 251).

On February 10, 2005, plaintiff again failed to call to advise the Center that he would be two hours late for work. Def. Ex. Z; Pl. Ex. 48. Following this incident, plaintiff received a verbal warning from defendant Appia. In a February 17, 2005 memorandum memorializing this warning, Appia noted that if plaintiff failed to advise the Center when he was running late in the future, he would be subject to disciplinary action. *Id.* Appia also reminded plaintiff that, because he had previously been placed on probation in August 2003, her discretion was limited. *Id.* According to plaintiff, his lateness was the

result of his having previously worked a double shift from 4:00 p.m. on February 9 to 8:00 a.m. on February 10.  While he did miss the 2:00 p.m. staff meeting, he arrived at work at 4:00 p.m. to start his shift.  *See* Pl. Ex. 25.

On February 25, 2005, plaintiff met with Appia to review his cases.  Def. Ex. BB; Pl. Ex. 37.  Appia wanted to review plaintiff's charts before she left for vacation, on March 1, 2005.  She determined that the charts were not in compliance with The Salvation Army's requirements, so she instructed plaintiff to update them and leave the service plans and case notes in her mailbox for review on February 28, 2005.  He did not do so.  *Id.*  Appia asked plaintiff where the requested documents were, and he replied he had filed them directly in the applicable charts.  Appia reviewed the charts with plaintiff's immediate supervisor, Karl Gladden, and found that her instructions had not been followed and that many of the charts remained out of compliance.  *Id.; see also* Def. Ex. CC; Pl. Ex. 37.[11]

Appia and plaintiff also discussed an incident that occurred shortly before the February 25, 2005, meeting.  According to Appia, plaintiff had insulted Appia loudly when he was required to cover an overnight shift following his regular shift because his replacement did not come into work as scheduled.  Def. Ex.

---

[11] According to Appia and Dan Lockspeiser, Appia's supervisor, plaintiff's case files also demonstrated that plaintiff was not meeting with his clients as often as was required.  Appia Decl. ¶ 9; Lockspeiser Decl. ¶ 31.

BB; Pl. Ex. 37. According to Appia, plaintiff apologized and
Appia acknowledged that he had a right to be angry, but should
have called her if he needed to leave. *Id.*

On April 6, 2005, Appia was out sick. *Id.* According to
Appia, she called into the Center about 5:00 p.m. and was
speaking with Bernard Whittaker, the Center's Operations
Manager.[12] *Id.* A topic came up that required plaintiff's input.
*Id.* At approximately 5:00 p.m. and 5:30 p.m. Whittaker made two
attempts to contact plaintiff via the Center's paging system.
Def. Ex. II. He was informed by staff members that plaintiff had
left. *Id.; see also* Def. Ex. JJ; Pl. Ex. 52. At approximately
6:00 p.m., Whittaker reported to Appia that plaintiff had not yet
returned. Def. Ex. BB. Appia instructed Whittaker to have the
security officer, Victor Scott, at the front desk log the time
plaintiff returned, which Scott did at 8:00 p.m. *Id.;* Def. Exs.
DD, HH, II; Pl. Exs. 40, 50, 51; *see also* Whittaker Decl.
Plaintiff acknowledges that he left the Center twice that night,
but for much shorter periods than defendant Salvation Army
contends, and that he was present for most of the period
Whittaker was looking for him. *See* Pl. Exs. 23, 25.[13] Another

---

[12] Plaintiff alleges that Whittaker was Appia's boyfriend and that he
started at The Center as cook and was unjustly promoted to Operations Director
due to his relationship with Appia. *See* Pl. Ex. 24; *see also* Pl. Ex. 10, at
201-205.

[13] Plaintiff's Exhibit 25 is a decision of the New York State
Unemployment Insurance Appeal Board. Although the Board found plaintiff
eligible for unemployment benefits and credited plaintiff's testimony

case manager at the Center, Jerdene Bachus, wrote a memorandum in which she stated that when she shared the 4:00 p.m. to midnight shift with plaintiff, he would often leave for periods of time and she would be the only social service staff present. Def. Ex. KK; Pl. Ex. 49.

Plaintiff was terminated by defendant Salvation Army on April 7, 2005. Def. Exs. F, AA; Pl. Ex. 23; Lockspeiser Decl. ¶ 14-15. Appia's supervisor, Dan Lockspeiser, Director of Outreach, approved plaintiff's termination and directed Appia to terminate plaintiff. Appia Decl. ¶ 7; Lockspeiser Decl. ¶¶ 14-15. The termination form stated, in the explanation section, that "Mr. Okon was absent from the facility from 5pm - 8pm on 4/6/05 without being authorized by a supervisor." Def. Exs. F, AA; Pl. Ex. 23. The form also included ratings of plaintiff's job performance, which ranged from "fair" to "good." *Id.* Defendant Appia signed the form in the space allotted for the person who rated plaintiff's performance. The remarks section contained the following statement: "Ongoing performance + disciplinary issues required more supervision than should be necessary for an employee with Mr. Okon's length of tenure." *Id.* The form was also signed by Lockspeiser and plaintiff. *Id.* In the exit interview, conducted by Appia, plaintiff made no

---

concerning the circumstances of April 6, 2005, there is no indication the Board had before it the evidence presented on this motion.

statement.  *Id.*

Plaintiff filed a "Charge of Discrimination" with the Equal Employment Opportunity Commission ("EEOC") on August 15, 2005. Pl. Ex. 5.  In the EEOC charge, plaintiff, under the heading "Harassment and Hostile Work Environment," stated:

> Ms. Tracy Appia threatened me with termination on a consistent basis, without basis.  She on several occasions has made me work double shifts without any recourse.  She impose [sic] herself has [sic] my immediate supervisor just to discredit my work and cases.  On numerous occasions, Ms. Appia has transferred my case to other case manager [sic] after I have completed my case plan with the client; without giving me a reason for the transfer; these [sic] has occurred with clients that I have on my caseload who are awaiting section 8/housing [sic].  She has consistently changed my shift without prior notification, forcing me to work three different shifts within the same week.  Ms. Appia intensely and egregiously supervised me continued [sic] to monitor me with my clients and ease dropping [sic] on my counseling sections with my clients.

Pl. Ex. 5.  Under the heading "Sexual Harassment," plaintiff stated:

> I was sexually harassed without cause.  Ms. Appia told me, concerning my involvement with my future wife: "Just for have a one-time-sex with a woman you don't know, just marry her."  This statement constituted an intrusion into my personal affairs.  Ms. Appia got angry that I got married to the same woman I was dating.  She questioned me on varies [sic] occasions concerning my wife, and recommended me [sic] not to marry her, and find [sic] a girl in the United States.

*Id.*  Following notice of the Charge to The Salvation Army, Pl. Ex. 7, the EEOC issued a "Notice of Right to Sue" on September

29, 2006.  Pl. Ex. 8.  This case followed.[14]

## Discussion

A.  <u>Summary Judgment Standard</u>

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Village of East Hills*, 320 F.3d 110, 117 (2d Cir. 2003).  A fact is material when it "might affect the outcome of the suit under the governing law." *Id*.

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987).  In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact.  Although all facts and

---

[14] Based on the filing date of the EEOC charge, Magistrate Judge Matsumoto ruled that events occurring prior to February 2005 fell outside the applicable statute of limitations and limited discovery accordingly.  Def. Ex. QQ.  This ruling was not appealed.

inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a "metaphysical doubt" as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports the pleadings. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). In deciding such a motion the trial court must determine whether "after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). "The salutary purposes of summary judgment-avoiding protracted, expensive and harassing trials-apply no less to discrimination cases than to . . . other areas of litigation," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), and courts have often noted that it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Schiano v. Quality Payroll Systems, Inc*., 445 F.3d 597, 603 (2d

Cir. 2006) (citing *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)).

B.  Title VII

Title VII prohibits discrimination in employment based on an employee's sex.  To succeed on a Title VII discrimination claim, the plaintiff must first offer ". . . evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).  In producing such evidence, a plaintiff establishes a prima facie case, creating a presumption of discrimination which shifts the burden of production to the defendant.  The defendant must then present a legitimate, non-discriminatory reason for the adverse employment action to rebut the presumption. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  The burden then shifts back to the plaintiff to prove that the stated reason is pretext, and ". . . that discrimination was the real reason for the employment action." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed2d 668 (1973); *Fisher v. Vassar College*, 114 F.3d 1332, 1336 (2d Cir. 1997) (en banc), cert. denied, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998)).

i. *Exhaustion*

Defendants argue that plaintiff cannot rely on allegations of pinching, cuddling, or fondling to support his claims of sexual harassment because he did not mention such conduct in his EEOC charge and, accordingly, has not complied with the exhaustion requirements of Title VII.  Plaintiff admits these allegations were not contained in his EEOC charge but argues that these allegations are "reasonably related" to those that were included and can be brought on that basis.

In Title VII cases, a district court only has jurisdiction over those claims included in the EEOC charge or those that are "reasonably related" to the allegations in the plaintiff's EEOC charge.  *Butts v. City of New York Dep't of Housing Preservation and Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993) *superseded by statute on other grounds as stated in Hawkins v. 1115 Legal Service Care*, 163 F.3d 684 (2d Cir. 1998).  The Second Circuit has set forth three scenarios where conduct alleged in a federal court complaint is "reasonably related" to conduct described in an EEOC charge.  They are when the conduct alleged in the complaint would 1) fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination; 2) constitute retaliation for filing a timely EEOC charge; or 3) constitute further incidents of discrimination perpetrated in the same manner as alleged in the

EEOC charge. *Id.* at 1402-03; *see also Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 83 (2d Cir. 2001). The second exception is not applicable as plaintiff was terminated prior to filing his EEOC complaint. The third is not applicable because cuddling, fondling, or pinching are quite different in manner than the conduct alleged in plaintiff's EEOC charge. The Second Circuit has described the first exception as "essentially an allowance of loose pleading" based on the recognition that plaintiffs often fill out EEOC charges without assistance from counsel. *Holtz*, 258 F.3d at 83; *Butts*, 990 F.2d at 1402.[15]

Courts, however, have refused to consider allegations made for the first time in a complaint when these new allegations make up the core of plaintiff's claim. *See McGuire v. United States Postal Service*, 749 F. Supp. 1275, 1287 (S.D.N.Y. 1990) ("[j]udicial claims which serve to amplify, clarify or more clearly focus earlier EEO[C] complaints are appropriate. Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate") (citation and internal quotation marks omitted); *Hansen v. Danish Tourist Board*, 147 F. Supp.2d 142, 153 (S.D.N.Y. 2001) (dismissing quid pro quo sexual harassment claim where

---

[15] Although the Second Circuit has not limited this exception to plaintiffs who file an EEOC charge *pro se* and I do not dispute plaintiff's assertion that he filled out his EEOC charge without assistance from counsel, I note that plaintiff provided the address of his attorney in the box requesting particulars of the discrimination. Pl. Ex. 5.

plaintiff did not allege in EEOC complaint sexual advance by supervisor); *Choi v. Chemical Bank*, 939 F. Supp. 304, 412 (S.D.N.Y. 1996) (court did not have subject matter jurisdiction over claims that bank failed to give plaintiff sufficient opportunities to advance throughout the course of his employment where plaintiff alleged only a specific instance of failure to promote in EEOC charge); *Campbell v. Grayline Air Shuttle, Inc.*, 930 F. Supp. 794, 800 (E.D.N.Y. 1996) (where plaintiff alleged only a "functional demotion" in her EEOC charge, court refused to hear later claims of decreased work hours and denial of office space); *Samimy v. Cornell Univ.*, 961 F. Supp. 489, 492 (W.D.N.Y. 1997) (on summary judgment, dismissing claims where complaint was "far more expansive than . . . single [allegation in] EEOC" charge).

Nor was plaintiff's EEOC charge sufficient to have alerted the EEOC to the conduct now alleged by plaintiff. In *Butts*, the Second Circuit affirmed the district court's dismissal of plaintiff's disparate treatment claims, where plaintiff had alleged only that she had "constantly been the target of discriminatory practices and treatment" and that she was "denied promotion opportunities and consideration based on my race and sex." 990 F.2d at 1403. In doing so, the Second Circuit noted:

> Were we to permit such vague, general allegations,
> quite incapable of inviting a meaningful EEOC response,
> to define the scope of the EEOC investigation and
> thereby predicate subsequent claims in the federal

> lawsuit, such allegations would become routine
> boilerplate and Title VII's investigatory and mediation
> goals would be defeated.

*Id.* Although plaintiff alleged in his EEOC charge that defendant

Appia forced him to work beyond his officially scheduled hours,

threatened him with termination, changed his shifts, and

supervised his work more than the work of other employees, among

other examples, plaintiff's EEOC charge provides no indication as

to what acts, or type of acts, contributed to the alleged hostile

work environment or that any of defendants' actions were

motivated by plaintiff's sex, beyond Appia's insensitive comment

concerning plaintiff's upcoming marriage and, possibly,

plaintiff's allegation that a woman was promoted instead of

him.[16]

The EEOC did pursue a limited investigation, obtaining a

statement from defendant and requesting that plaintiff provide,

in a rebuttal statement,[17] any reasons he believed defendants'

explanation of the actions plaintiff complained about was

pretextual.  *See* Pl. Exs. 7-8.  The EEOC's investigation into

plaintiff's complaints of onerous work conditions and unjustified

complaints about plaintiff's work, however, would not have lead

to discovery of the cuddling, fondling, and pinching plaintiff

---

[16]  Plaintiff, however, also alleged a man was promoted over him.
Further, as noted above, plaintiff never applied for any promotions.

[17]  Plaintiff permissibly sought a right to sue letter on September 12,
2006, rather than provide the rebuttal information requested by the EEOC.  Pl.
Ex. 8.

now alleges. *See Briggs v. New York State Dep't of Trans.*, 233 F. Supp.2d 367, 376-77 (N.D.N.Y. 2002) (plaintiff failed to exhaust administrative remedies where she alleged that she was kissed, called derogatory names, made the subject of untrue sexual rumors, and more in lawsuit but alleged in her EEOC charge only that she was the subject of a hostile work environment because her driving certification had been revoked and she had been required to undergo psychiatric evaluations); *Crespo v. New York City Transit Authority*, 2002 WL 398805, at *9 (E.D.N.Y. Jan. 7, 2002) ("simply put there is no reason to conclude that an investigation into charges of allegedly fabricated 'performance deficiencies' and 'infractions' would lead an investigator to inquire about instances of sexual harassment, or about a hostile work environment"); *Castro v. New York City Dep't of Sanitation*, 2000 WL 1514630, at *6 (S.D.N.Y. Oct. 12, 2000) (granting summary judgment where EEOC charge alleged only discrimination in the form of onerous work conditions and unjustified complaints about plaintiff's work while lawsuit alleged unwanted touching, exposure to pornography, obscene phone calls, and other matters), *aff'd*, 13 Fed.App. 63 (2d Cir. 2001).

Moreover, if the allegations of the pinching, cuddling, and fondling are true, then the only reason to not have included them in any of the submissions to the EEOC would have been to obtain a right to sue letter and bypass the EEOC's conciliation process.

*See Holland v. Project Return Foundation*, 1998 WL 790935, at *1
(S.D.N.Y. Nov. 13, 1998) (granting summary judgment where
plaintiff failed to cooperate with EEOC investigation, which
limited "the possibility of EEOC resolving claims through the
congressionally-preferred approach of 'conference, conciliation,
and persuasion'") (citing 42 U.S.C. § 2000e-5(b)); *Perez v.
Communications Workers of America Local 1109,* 2005 WL 2149204, at
*8 (E.D.N.Y. Sept. 6, 2005)(plaintiff's allegations were not
exhausted where his lack of cooperation forced abandonment of
investigation); *see also Choi*, 939 F. Supp. at 313 (EEOC "cannot
be expected to investigate mere generalizations of misconduct,
nor can defendants adequately respond to them").

Accordingly, plaintiff failed to exhaust his administrative
remedies with respect to claims of pinching, cuddling, and
fondling.

ii. *Remaining Title VII Claims*

a. <u>*Hostile Work Environment*</u>

The Supreme Court has interpreted Title VII to prohibit ". .
. requiring people to work in a discriminatorily hostile or
abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S.
17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citing *Meritor
Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91
L.Ed.2d 49 (1986)).  To succeed on a hostile work environment
claim, a plaintiff must show that ". . . the workplace is

permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Id*. at 21. Factors to consider in determining whether an environment is hostile or abusive include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[18] *Id*. at 23. Although "[t]he incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred . . ." they must occur under circumstances in which " . . . the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." *Svenningsen v. College of Staten Island*, 2003 WL 21143076, at *2 (E.D.N.Y. 2003) (citing *Gregory v. Daly*, 243 F.3d 687, 694-95 (2d Cir. 2001)). Isolated incidents of offensive conduct are generally inadequate to establish a discrimination claim, and plaintiff must show "either a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted" to cause a

---

[18] A plaintiff may assert a hostile work environment claim under Title VII if one predicate act occurs within the filing period, which is consistent with Title VII's requirement that the statute of limitations begins to run once the act has "occurred." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Since all of the predicate acts are part of a single claim, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id*.

change in the work environment.  *Howley v. Town of Stratford*, 217

F.3d 141, 153 (2d Cir. 2000) (citation omitted).

Plaintiff's complaints concerning unfair disciplinary

actions, shift changes, uncompensated hours, his termination, and

Appia's comment concerning his fiancée do not demonstrate a

hostile work environment on the basis of plaintiff's sex.

Plaintiff's allegations are on the whole sex neutral.  While the

Court must consider the "totality of the circumstances," there

must be some circumstantial or other basis for inferring that

these incidents were in fact discriminatory.  *Alfano v. Costello*,

294 F.3d 365, 378 (2d Cir. 2002).

Without the allegations of pinching, cuddling, and fondling,

there is no such basis on the undisputed facts in this case.

Even after Appia arrived at the Center, several of the incidents

concerning plaintiff's work performance and disciplinary action

taken against him did not involve Appia in any meaningful way.

Plaintiff's August 2002 performance review was conducted by Robin

Deroche and Appia's involvement was limited to signing the

report.  Pl. Ex. 22.  Timothy Ruffin sent plaintiff a memorandum

in April 2003 concerning plaintiff's substandard case files and

Ruffin's intention to impose a disciplinary sanction at their

next meeting.  Def. Ex. V; Pl. Ex. 44.  Jeanette Charles issued

the December 2003 memorandum reminding plaintiff of his duty to

attend all staff meetings, after he missed a mandatory meeting on

December 16, 2003.

Only a handful of events involving Appia, over the course of nearly three years, remain.  Most are minor, such as verbal warnings issued for missing meetings and reminders to follow the proper procedures when running late.  The more serious actions, plaintiff's probation and termination, echo the concerns of plaintiff's other supervisors.

The only exhausted allegation that could support the inference that Appia was improperly motivated in disciplining and ultimately terminating plaintiff is her May 2003 comment concerning his impending marriage.  While plaintiff appears to have been placed on probation immediately upon his return from his wedding, Appia's single statement cannot be the basis imputing discriminatory motives to all of Appia's subsequent actions, particularly when other employees at the Center were expressing similar reservations about plaintiff's work.  *See Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004); *see also O'Connor v. Viacom, Inc.*, 1996 WL 194299, at *5 (S.D.N.Y. Apr. 23, 1996), *aff'd* 104 F.3d 356 (2d Cir. 1996).

Defendants motion for summary judgment on plaintiff's hostile work environment claim is granted as no fact-finder could reasonably find that defendants created a hostile work environment.

b. *Quid Pro Quo*

To state a quid pro quo claim, plaintiff must show a "tangible employment action," i.e., that an "explicit ... alteration[ ] in the terms or conditions of employment" resulted from his refusal to submit to unwelcome sexual conduct. *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (internal quotation marks and citation omitted); *see also Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 97 (2d Cir. 2002). A tangible employment action usually "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Mormol*, 364 F.3d at 57 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). In this matter, the tangible employment action is plaintiff's termination.[19]

Even if plaintiff could make out a prima facie case of quid pro quo sexual harassment, defendant may avoid liability by articulating some "legitimate, nondiscriminatory reason for the employee's" termination. *Robles v. Cox & Co., Inc.*, 154 F. Supp.2d 795, 803 (S.D.N.Y. 2001) (citing *McDonnell Douglas*, 411 U.S. at 802). Defendants have presented plaintiff's prolonged unsatisfactory job performance, which culminated in his being

---

[19] Any other discrete acts would be barred by Title VII's applicable filing period, *see Morgan*, 536 U.S. at 114, or would not fall within the definition of a tangible employment action.

absent from the Center for a three-hour period the day before his termination, as a legitimate, non-discriminatory reason for firing plaintiff.[20] *Dzaba v. Haythe & Curley*, 1996 WL 31156, at *4-5 (S.D.N.Y. Jan. 26, 1996) (poor evaluations permit inference that employee was terminated for poor performance and not unlawful discrimination); *Stein v. McGraw-Hill, Inc.*, 782 F. Supp. 207, 212-13 (S.D.N.Y. 1992) (same).

Upon being presented with evidence of a legitimate, non-discriminatory reason for the adverse employment action taken by the defendant, "[t]he plaintiff 'must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination.'" *Mario v. P & C Foods Mkts., Inc.*, 313 F.3d 758, 767 (2d Cir. 2002) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 120 S.Ct. 2097 (2000)). "[A]n employer would be entitled to judgment as a matter of law . . . if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S.

---

[20] Plaintiff disputes that Appia reviewed plaintiff's case files or discussed his work performance with him in February 2005 and disputes that defendant's Exhibit CC is authentic. He presents no evidence to substantiate these conclusory allegations and thus they cannot defeat summary judgment. Plaintiff's citation to *Branson v. Ethan Allen, Inc.*, 2004 WL 2468610 (E.D.N.Y. Nov. 3, 2004) is inapposite as in that case the plaintiff had only one warning in her personnel file prior to the hiring of her new supervisor who issued several verbal and written complaints in a short period.

at 148.

Lockspeiser directed Appia to terminate plaintiff, based on his interviews with the relevant personnel and Appia's report. This fact supports defendant's position, as plaintiff presents no evidence that Lockspeiser was aware of Appia's alleged harassment or was motivated himself by a discriminatory purpose.

However, as Appia was clearly involved in the decision to terminate plaintiff, plaintiff could still succeed if he showed her role in the termination was motivated by plaintiff's sex. *See, e.g ., Rose v. N.Y. City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001) (discriminatory comments of plaintiff's supervisor, who did not have formal firing authority but "who had enormous influence in the decision-making process," constituted direct evidence of discrimination).

Plaintiff has produced no evidence that Appia's report to Lockspeiser was pretext for sexual discrimination.[21] For the reasons set forth in Part B.ii.a., *supra*, and, in particular, because it occurred nearly two years before plaintiff's termination, Appia's comment regarding plaintiff's fiancée cannot establish pretext. Moreover, the record is replete with evidence

---

[21] Plaintiff argues that are a number of inconsistencies in the testimony, declarations, and exhibits and that these inconsistencies demonstrate pretext. None of the inconsistencies alters the conclusion that, as noted in the Center's security log, plaintiff returned to the Center at 8:00 p.m. and that Lockspeiser was advised and believed that defendant was absent for three hours. Further, even if plaintiff were at the Center, he has presented no evidence to demonstrate that those involved in his termination were aware of his presence.

indicating plaintiff's poor job performance.  While a jury may reject an employer's evaluations as justification for termination, *see Kirschner v. Officer of the Comptroller*, 973 F.2d 88, 94-95 (2d Cir. 1992), no fact-finder could do so on this record.[22]

Even assuming plaintiff could rely on his allegations of pinching, cuddling, and fondling, he could not recall any specific instances in April of 2005.  All other inappropriate physical conduct that he could recall in any detail occurred nearly two years prior to plaintiff's termination.  Plaintiff does allege that his wife visited the center shortly before his termination, but Appia was out sick on April 6, 2005 and it was Whittaker[23] who reported the three-hour absence to Appia. Accordingly, plaintiff has not presented an issue of fact as to

---

[22] Plaintiff argues that he did not receive poor performance reviews or warnings prior to Appia's arrival at the Center.  Whether the records are termed warnings or memoranda, there is no doubt that plaintiff's prior supervisors had many concerns about plaintiff's performance, several of which were similar to Appia's.  Further, plaintiff is simply wrong in stating that none of the documents were warnings.  For example, the March 24, 2000 memorandum from Garcia states that plaintiff's failure to address the concerns therein would lead to probation or possible termination.  Def. Ex. O; Pl. Ex. 32.  Further, the April 30, 2003 memorandum to plaintiff from Timothy Ruffin expressly contemplates future disciplinary action.  Def. Ex. V; Pl. Ex. 44. It is worthy of note that Ruffin's review took place while Appia was the Program Director at the Center.  While plaintiff voiced his objections to certain disciplinary actions prior to Appia's arrival, there is no indication that anyone at The Salvation Army agreed the sanctions to which plaintiff objected were imposed in error.
    Plaintiff's argument that Appia should not have issued him warnings because she was not plaintiff's immediate supervisor is equally unavailing. Appia's job description placed her in charge of the entire Center and required her to supervise all subordinates.

[23] Plaintiff alleges that Whittaker was Appia's boyfriend, but the claim is unsupported beyond the conclusory allegations of plaintiff and Wanda Jordan.

whether the rationale provided by defendant Salvation Army for plaintiff's termination is pretextual and defendants' motion for summary judgment on plaintiff's quid pro quo claim is granted.[24]

C.  Section § 1983 Claim

Plaintiff also asserts a claim under 42 U.S.C. § 1983 alleging that defendants violated the Fourteenth Amendment to the United States by subjecting plaintiff to a sexually hostile and quid pro quo work environment.  However, a plaintiff can prevail on a § 1983 claim only when the injuries were caused by the state or those acting under color of state law. 42 U.S.C. § 1983; *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992). Plaintiff argues that defendant Salvation Army acted under color of state law because its program is funded by the New York City Department of Homeless Services and that providing services to the homeless is a public function.

That defendant Salvation Army is regulated and, in part, funded by New York City does not require a finding that it was acting under color of law.  The Supreme Court has refused to find state action merely because some of the actions of a private organization are regulated by the government. *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). Rather, in order for there to be state action based on licensing

---

[24]  I note that since individuals are not subject to liability under Title VII, plaintiff's Title VII claims against Appia must be dismissed in any event on this ground.  *Mandell v. County of Suffolk*, 316 F.3d 377 (2d Cir. 2003) ("under Title VII individual superiors are not subject to liability").

or regulation, it must be shown that the government commanded or encouraged the alleged wrongdoing.  There must be a "sufficiently close nexus between the State and the challenged action . . . so that the action . . . may be treated as that of the State itself." *Id.* at 1004 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353 (1974)); *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 841-42, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (no state action exists where extensively regulated private school discharged teachers, in that school's employment practices were not compelled or influenced by state regulations, but rather were unrelated to the school's educational practices). Nor are allegations of state funding sufficient to establish state action.  *Kohn*, 457 U.S. at 838.

Plaintiff cites *Lown v. Salvation Army*, 393 F. Supp.2d 223 (S.D.N.Y. 2005), to support his claim that The Salvation Army should be considered a state actor.  In *Lown*, however, Judge Stein determined that the relevant conduct to examine in determining whether plaintiff was a state actor was not the services for which an employee was engaged but The Salvation Army's employment practices.  *Id.* at 242.  Judge Stein concluded that there was no indication of any state actor participating in The Salvation Army's employment decisions and that personnel management is not traditionally within the exclusive province of the state.  *Id.* at 242-44.  He also concluded that funding and

regulation of certain of the services provided The Salvation Army were insufficient to establish it as acting under color of law. *Id.* He thus concluded that The Salvation Army was not a state actor. *Id.* at 244.

Several courts have reached the same result. While providing services to the homeless can be viewed as a public function, "[t]he provision of food and shelter to the homeless is hardly an exclusive prerogative of the State." *Stone v. New York City Dep't of Homeless Servs.*, No. 04 CV 2885, at * 17 (E.D.N.Y. January 21, 2005) (dismissing § 1983 claim against The Salvation Army), *aff'd* 159 Fed.Appx. 324 (2d Cir. 2005); *see also Lindsey v. Normet*, 405 U.S. 56, 74 (1972) (there is no government obligation to provide adequate housing); *Williams v. Crawford*, 1988 WL 52198, at *2 (E.D.N.Y. May 13, 1988) (allegations that The Salvation Army's Brooklyn Rehabilitation Center was regulated by the state did not make out state action); *Vargas v. Salvation Army*, 649 F. Supp. 763, 768 (N.D. Ill. 1986) (determining that The Salvation Army, even when operating under the regulation and control of the state, does not perform a public function in caring for the sick and elderly). Accordingly, defendants' motion for summary judgment on plaintiff's § 1983 claim is granted.[25]

---

[25] Plaintiff seeks leave to re-plead his § 1983 claim. As it would be futile, I deny plaintiff's motion. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

D. <u>State Law Claims</u>

Plaintiff's remaining claims (claims 3-7) against defendants are based on state law. Since I grant defendants' motion for summary judgment on plaintiff's Title VII and § 1983 claims, I decline to exercise pendent jurisdiction over plaintiff's state law claims. They are accordingly dismissed.

### Conclusion

For the reasons set forth above, defendants' motion for summary judgment is granted. The Clerk is directed to enter judgment in favor of defendants. The Clerk is directed to transmit a copy of the within to all parties and the assigned Magistrate Judge.

SO ORDERED.

Dated : Brooklyn, New York
        May 28, 2008

                    By: <u>/s/ Charles P. Sifton (electronically signed)</u>
                        United States District Judge